GIUSEPPE MEMMOLO'S CASE.

Suffolk. October 14, 1983. — January 23, 1984.

Present: GRANT, PERRETTA, & SMITH, JJ.

*Workmen's Compensation Act*, Serious and wilful misconduct of one exercising superintendence. *Words*, "Serious and wilful misconduct."

A reviewing panel of the Industrial Accident Board properly concluded that an employee injured when he struck an energized electrical cable with his air hammer while excavating a street for sewer repairs was entitled to double compensation benefits under G. L. c. 152, § 28, by reason of his employer's serious and wilful misconduct, where there was no evidence either that the employer had provided public utility companies with the forty-eight hours' notice of intended excavation required by G. L. c. 82, § 40, or that, although a telephone calling system had been established for giving notice in an emergency, the employer had given notice by this means. [411-412]

CERTIFICATION to the Superior Court of a decision of the Industrial Accident Board.

The case was heard by *Abrams*, J.

*George S. Chefitz* for the employee.

*Eugene X. Giroux*, for the employer (*Eli Fleishman*, for the insurer, with him).

PERRETTA, J. General Laws c. 82, § 40, as amended by St. 1968, c. 403, § 1, and as in effect on the day here in question, October 28, 1977, prohibits the making of an excavation on a public way without at least forty-eight hours prior written notice to public utility companies of the intention to excavate. Compliance with § 40 is excused in cases of "emergency." While drilling in an area beneath the street in order to make repairs on a sewer line on October 28, 1977, the employee, Giuseppe Memmolo, struck an electric cable with his air hammer. He was severely injured and sought

double compensation benefits under G. L. c. 152, § 28.[1]  A single member of the Industrial Accident Board, whose findings were affirmed and adopted by the reviewing board (board), found that the employer, Bond Brothers, Inc. (Bond), had failed to show that it had complied with c. 82, § 40, or that an emergency existed to excuse its noncompliance, and that its actions constituted serious and wilful misconduct entitling the employee to enhanced benefits.  We conclude that the board's decision was warranted on the facts and law and reverse the Superior Court judgment dismissing the employee's claim under c. 152, § 28.

1. *Evidence Before the Single Member.*

The trial judge "was obligated, and this court on appeal is obligated, to sustain the decision of the board, which supersedes that of the single member, *Haley's Case,* 356 Mass. 678, 679 (1970), if there was any evidence to warrant the conclusion that the employee was 'injured by reason of the serious and wilful misconduct of an employer or of any person regularly intrusted with and exercising the powers of superintendence.' G. L. c. 152, § 28." *O'Leary's Case,* 367 Mass. 108, 111 (1975).  Evidence of the following facts was presented to the single member.

a. *The Injury.*

Some time on October 26, 1977, a representative of Gulf Oil Company (Gulf) telephoned Bond and requested that repair work be done on a street sewer line connected with its Chelsea property.  Acting on instructions from Bond, one Charles Sclafani, a foreman at Bond, went to the Gulf property, an office building, and observed that the lavatory facilities were backed up, filled to the top, and that there was a water drainage problem.

---

[1] General Laws, c. 152, § 28, as appearing in St. 1943, c. 529, § 9, provides in relevant part:  "If the employee is injured by reason of the serious and wilful misconduct of an employer or of any person regularly intrusted with and exercising the powers of superintendence, the amounts of compensation hereinafter provided shall be doubled.  In case the employer is insured, he shall repay to the insurer the extra compensation paid to the employee.  If a claim is made under this section, and the employer is insured, the employer may appear and defend against such claim only."

Prior to 7:30 A.M. the next day, Sclafani ascertained the source of the blockage by running a plastic rod down the drain and into the sewer line. Once the source of the problem was located, Sclafani measured and marked off a square on the asphalt surface of the street. He knew what pipe he was looking for because a Gulf representative had given him a diagram, or blueprint of the "sewer and connector" from the street to the office building. There were no markings on the street to indicate whether there were any utility lines beneath the surface of the street.

Memmolo was assigned by Bond to work with Sclafani on the repair project. Memmolo had arrived in this country in 1975 from Italy, where he had received only four years of schooling and had earned his livelihood as a farmer. He was employed by Bond as a laborer, doing drill work.

Memmolo reported to the Chelsea job site at 7:30 A.M. on October 27, 1977. He saw the street markings earlier made by Sclafani, who was also at the site. Sclafani instructed Memmolo to excavate at the markings with a jack-drill until he reached the pipe. By the end of the work day, 4:00 P.M., Memmolo had excavated about five feet, and the pipe was visible. He returned to the job site the next morning, told Sclafani, "I see concrete down there," and was told by Sclafani not to worry, "you can go on working." Memmolo then continued to excavate with the drill as instructed and "all of a sudden flames came all over me and I was burning." Just before the flames, Memmolo "heard like an explosion, a big noise."

Almost immediately after the accident, James Behenna, a special investigator with Boston Edison Company, went to the Chelsea excavation site and saw water and a Boston Edison duct line[2] in the hole.

b. *The Emergency.*

The evidence on the question whether the condition existing on Gulf's property constituted an emergency is, for the most part, conclusory. For example, when a representative

---

[2] The witness described a duct line as a "cement envelope type with pipes inside of it . . . [i]n the pipe there would be wiring."

of Gulf called Bond, the representative allegedly described the situation as an emergency.  On or about October 26th or 27th, Bond prepared written applications, which were apparently presented to the Department of Public Works, at some unascertained time,[3] seeking permission to excavate "on an emergency basis" in order "to make emergency repairs to sewerline . . . in front of 123 Eastern Ave. . . . Chelsea."  No information as to the nature of the "emergency" is contained in these documents.  Indeed, the only evidence appearing in the record which bears upon the circumstances of the "emergency" is Sclafani's statement that "the toilets were backing up and sanitary facility sinks . . . [t]hey were filled up to the top."

Evidence discrediting the notion of an exigent situation is found in Bond's previously described applications wherein permission to excavate was sought for "an estimated period of 5 days" and in the testimony of Sclafani and Memmolo, that on their first day of work at the job site, they worked a "normal" work day, 7:30 A.M. to 4:00 P.M.

c. *The Notice of Excavation.*

As previously stated, on the day of the accident, G. L. c. 82, § 40, required Bond, in the absence of an emergency, to give advance (at least forty-eight hours) written notice of the intended excavation work.  There is no question that Bond did not do this.

In the face of an emergency, the statute continues, notice "shall be given as soon as may be practicable."  On this point, there was evidence of the existence of a "dig safe" telephone calling system, whereby a contractor could call a particular number to inform the public utilities of the excavation work.  An officer of Bond testified that he "assume[d]" a "dig safe" call had been made by someone at Bond prior to the commencement of the work, but he could not say when such a call was made, or by whom, or that the call had in fact been made.[4]

---

[3] The record indicates that four days after the accident, the department issued to Bond a permit to "proceed with the work."

[4] Based upon information received from others in the course of his investigation, Behenna testified that Boston Edison Company did not receive a

d. *The Single Member's Findings.*

The single member found that Memmolo, following the orders of his foreman, Sclafani, used an air hammer to drill and excavate the marked area and in so doing struck an electric cable. The single member further found that the "dig safe" number "was not used to inform Public Utilities of the excavation," that Bond had failed to prove "beyond a reasonable doubt" that an emergency had in fact existed, that Bond had not complied with c. 82, § 40, that Bond's actions constituted "serious and wilful misconduct," and that Memmolo was seriously injured as a result of Bond's actions.

2. *Discussion.*

The defendants contend that the evidence did not warrant the findings: (1) that Bond failed to give notice as required by c. 82, § 40; (2) that an emergency did not, in fact, exist; (3) that Bond's actions were serious and wilful misconduct; and (4) that Memmolo's injuries were the result of Bond's actions. These claims "are largely predicated on the mistaken premise that this court can make its own independent findings of fact." *Lovasco's Case,* 4 Mass. App. Ct. 854, 855 (1976).

The documents which Bond sent or delivered to the department establish that Bond did not give timely written notice under § 40. However, it remained open to Bond to show that it fell within the exception to the general prohibition, that is, that an emergency existed. See Locke, Workmen's Compensation § 502 & n.15 (2d ed. 1981). Cf. *Commonwealth* v. *Jones,* 372 Mass. 403, 405-406 (1977). Whether an emergency in fact existed is here immaterial because § 40 requires that in an exigent situation, notice be given "as soon as may be practicable."[5] There was evidence to show

---

"dig safe" call from Bond. Bond and the insurer argue that this testimony was inadmissible hearsay and "not worthy of consideration" for the reasons discussed in *Julian* v. *Randazzo,* 380 Mass. 391, 393 (1980). As Behenna's testimony is unnecessary to the single member's findings, as will be seen, we do not consider this contention.

[5] An emergency has been defined as "an unforeseen, sudden, or unexpected combination of circumstances which calls for immediate action." *United States* v. *New York Cent. R.R.,* 64 F. Supp. 499, 501 (D. Mass. 1946). See also *Prescott* v. *Secretary of the Commonwealth,* 299 Mass. 191, 200 (1938).

that immediate advance notice could have been given simply by making a "dig safe" call. Assuming for purposes of decision that an emergency did exist and putting aside Behenna's testimony, as the defendants insist we must (see note 4, *supra*), the only evidence to show that notice was given "as soon as may be practicable" was the testimony of Bond's officer to the effect that he "assumed" that the "dig safe" call had been made prior to the excavation work.

Bond's violation of c. 82, § 40, is "some evidence of [its] negligence as to all consequences the statute was intended to prevent." *Adamian* v. *Three Sons, Inc.*, 353 Mass. 498, 499 (1968), and authorities therein cited.[6]  But, apart from the statute, we think it obvious to the average and reasonable person, not to mention a professional contractor engaged in excavation work, that electrical wires and gas mains as well as sewer pipes may be located under street surfaces.  Even if correction of the conditions existing at Gulf could not have been delayed by forty-eight hours, the condition was not so extreme as to prevent Bond from making certain of the existence and location of electrical wires in the area to be excavated.

The board's finding that Bond's actions constituted serious and wilful misconduct in respect to Memmolo's injuries is neither unwarranted on the evidence nor vitiated by error of law.  For discussion of the term "serious and wilful misconduct" as used in G. L. c. 152, § 28, see *Scaia's Case*, 320 Mass. 432, 434 (1946); *Dillon's Case*, 324 Mass. 102, 110 (1949); *O'Leary's Case*, 367 Mass. 108, 115-116 (1975), reaffirming and clarifying reliance on Restatement of Torts § 500 (1934), and Restatement (Second) of Torts § 500 (1965).  The board's determination should have been sustained.

---

[6] Although § 40 was amended by St. 1980, c. 502, § 1, so as also to provide, in pertinent part, that "[a]ny such excavation shall be performed in such manner, and such reasonable precautions taken to avoid damage to the pipes, mains, wires or conduits in use under the surface . . .," see also *Yukna* v. *Boston Gas Co.*, 1 Mass. App. Ct. 62, 66-67 (1973), we do not construe that provision as excluding injury to people from the same general risk at which the statute is obviously directed.  See Restatement (Second) of Torts §§ 286, 288 (1965); Prosser, Torts § 36, at 195 et seq. (4th ed. 1971).

The judgment is reversed and a new judgment is to be entered awarding the employee double benefits. Costs and expenses of this appeal shall be determined and allowed by a single justice of this court.

*So ordered.*